**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

IN RE:                                                    In Proceedings
                                                         Under Chapter 7
DAVID B. FREDMAN,
SHEILA V. FREDMAN,
                                                         Case No. 11-40791
            Debtor(s).

OPINION

     In a matter of first impression in this District, the Court is asked to decide whether above-median chapter 7 debtors, in performing the means test, may deduct mortgage payments on real estate that they intend to surrender.  In this case, the United States Trustee (UST) is challenging the debtors' decision to proceed in a chapter 7 case as an abuse of the Bankruptcy system as defined in 11 U.S.C. §§ 707(b)(1), (b)(2) and (b)(3) of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.  The Court must decide first whether the debtors may include mortgage payments on scheduled-for-surrender real estate when calculating their average monthly payments on account of secured debts set forth in § 707(b)(2)(A)(iii).  If the Court finds in the debtors' favor on the issue of the to-be-surrendered real estate, an evidentiary hearing will be scheduled to determine if there has been abuse as defined in § 707(b)(3).

     The relevant facts, taken from the record of this case, are not in dispute.  The debtors resided in a home in Englewood, Colorado from October 2001 until August 2009.  The home was encumbered by a first mortgage of $232,479.15 held by Chase Home Finance LLC, with monthly payments of $1,782.08, and a second mortgage of $68,886.29 held by BAC Home Loans Servicing LP, with monthly payments of $191.15.  After Mr. Fredman suffered the loss of a lucrative employment situation and eventually settled in a lower-paying position, the debtors

ceased making mortgage payments for this home in December 2010.  No payments were made on the home after that date.

Approximately six months later, on June 7, 2011, when they filed a chapter 7 petition for relief, the debtors were living in a home that they owned in Marion, Illinois.  With a current monthly income[1] of $8,242.06, the debtors were considered to be above the median income for a family of their size in Illinois.  11 U.S.C. § 707(b)(7).  The Marion home was encumbered by a mortgage held by Chase Home Finance LLC for $48,789.19, with monthly payments of $546.32. The debtors listed both the Colorado and the Marion homes on Schedules A and D.  The debtors' Statement of Intention, filed on the petition date, declared "under penalty of perjury" that they intended to surrender the Colorado home.  Their intent to surrender the Colorado home was expressed further by a solitary mortgage payment for the Marion home appearing as an expense on Schedule J, signaling that the debtors were not making payments on the Colorado home.  In addition, their intent to surrender the Colorado home was reflected by the absence of mortgage payments for the Colorado home on line 20B(b) of the B22A form,[2] calling for "Average Monthly Payment for any debts secured by your home, if any, as stated in Line 42"  and by their claim of a homestead exemption for the Marion home.

Nonetheless, on line 42 of the B22A form, entitled "Future payments on secured claims," the debtors included payments for the first and second mortgages on the to-be-surrendered Colorado home along with the mortgage payment for the Marion home.  The inclusion of the Colorado mortgage payments on lines 42(a) and (c) allowed the debtors to include $1,973.23 in

---

[1] The term "current monthly income" is defined at 11 U.S.C. § 101(10A) and is based on an averaging of monthly income during a 6-month "look back" period preceding the bankruptcy filing.

[2]   Both Schedule J and the B22A form were filed with the petition for relief on June 7, 2011. On August 10, 2011, the debtors filed an amended B22A form.  The changes contained in the amended B22A form do not affect the issues before the Court today.  All further references will be to the amended B22A form.

phantom monthly debt payments in the figure of $8,469.39 that they placed on line 47 of the B22A form, constituting the "[t]otal of all deductions allowed under § 707(b)(2)." After further computation, the inclusion of the phantom Colorado mortgage payments resulted in the debtors having a negative "60-month disposable income under § 707(b)(2)" of -$13,639.80.[3]  Since this figure was less than the $7,025 figure provided for comparison at line 52 of the B22A form, the debtors found that the presumption of abuse did not arise and that they were entitled to proceed in a chapter 7 case.

Among other concerns, the treatment of the Colorado mortgages described above prompted the UST to file a statement of presumed abuse on July 27, 2011, followed on August 26, 2011, by the instant motion to dismiss the debtors' case.  Then, Chase Home Finance LLC filed a motion for relief from the automatic stay, due to the debtors' default under its mortgage(s)[4] on the Colorado home.  An order lifting the automatic stay was entered, without objection, on November 29, 2011.

With the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), 11 U.S.C. § 707(b) was amended to add a screening mechanism, known as the "means test."  The purpose of the means test is to weed out chapter 7 debtors who are capable of funding a chapter 13 case.[5]  The issue before the Court today centers on a provision of the means test that allows a debtor to take deductions for certain secured debts.  This provision states:

---

[3]  At lines 48 through 50 of their B22A form, the debtors subtracted the $8,469.39 expense figure from their current monthly income of $8,242.06 to arrive at a monthly disposable income of -$227.33.  After multiplying their negative disposable income of -$227.33 by 60, as called for by line 51 of the B22A form, the debtors arrived at -$13,639.80 for their 60-month disposable income under § 707(b)(2).

[4]  For purposes of accuracy, the Court notes that although Chase Home Finance LLC states in its motion for relief from the automatic stay that it holds two mortgages on the Colorado home, BAC Home Loans Servicing LP is listed on Schedule D as the second mortgagee on the Colorado property.

[5]  The means test is not exclusive to chapter 7 debtors.  Those chapter 13 debtors who report income that is above the median for their state and household size are also subjected to means testing in that their "reasonably necessary"

3

      **(iii)** The debtor's average monthly payments on account of secured debts shall be calculated as the sum of—

           **(I)** the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the filing of the petition; and

           **(II)** any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts;

      divided by 60.

11 U.S.C. §  707(b)(2)(A)(iii).

In particular, the parties in the instant case call upon the Court to find the meaning of the phrase "scheduled as contractually due to secured creditors in each month of the 60 months following the date of the filing of the petition," which phrase appears in § 707(b)(2)(A)(iii)(I). The UST contends that the phrase in question prevents the Fredmans from deducting the mortgage payments on the Colorado home that they will be surrendering because they have not shown the payments as contractually due on their schedules.  Rather, according to the UST, the debtors' schedules show that they will not make the payments during the 60-month period following the date of the filing of the bankruptcy petition.  The Fredmans counter that the phrase permits such a deduction because the Colorado mortgages remained contractually due on the petition date despite the debtors' expressed intention to surrender the home to the lenders.  Their dispute centers upon two points:  (1) the meaning of the term "scheduled as" and (2) whether the phrase at issue demands a mechanical, snap-shot approach taken on the petition date or a realistic, forward-looking approach that takes into account the inevitable surrender of the home.

---

expenditures are to be determined in accordance with § 707(b)(2)(A) and (B).  11 U.S.C. § 1325(b)(3)(B).  *See, In re Scott*, 457 B.R. 740, 743 (Bankr. S.D. Ill. 2011).

The tenets of statutory construction require the Court to begin with the plain language of a statute in an effort to parse its meaning. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989).   However, where that meaning is ambiguous or leads to a senseless result, the Court should examine the text with the goal of uncovering the legislative purpose behind the words. *Lamie v. United States*, 540 U.S. 526, 534 (2004).   In *United States v. Balint*, 201 F.3d 928, 932-33 (7th Cir. 2000), the Court of Appeals for this Circuit outlined the rules of construction that allow departure from the plain meaning rule when literal interpretation leads to an outcome that is patently contrary to congressional intent or that produces an absurd result.   The *Balint* court stated:

> When we interpret a statute, we look first to its language. *Pittway Corp. v. United States*, 102 F.3d 932, 934 (7th Cir.1996). If that language is plain, our only function is " 'to enforce it according to its terms.' " *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)). The plain meaning of a statute is conclusive unless "'literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" *Ron Pair*, 489 U.S. at 242 (quoting *Griffin v. Oceanic Contractors*, 458 U.S. 564, 571 (1982)). Therefore, our interpretation is guided not just by a single sentence or sentence fragment, but by the language of the whole law, and its object and policy. See *Grammatico v. United States*, 109 F.3d 1198, 1204 (7th Cir.1997) (citing *United States v. Heirs of Boisdore*, 49 U.S. (8 How.) 113, 12 L.Ed. 1009 (1849)). Further, we may adopt a restricted rather than a literal meaning of a word where acceptance of the literal meaning would lead to absurd results. See *Chicago Transit Auth. v. Adams*, 607 F.2d 1284, 1289-90 (7th Cir.1979); *see also Commissioner v. Brown*, 380 U.S. 563, 571 (1965).

*United States v. Balint*, 201 F.3d at 932-33 (parallel citations omitted).   With these rules in mind, this Court turns to an analysis of the statutory language at issue here.


### The Meaning of "Scheduled As"

The debtors' interpretation of the phrase "scheduled as" follows the meaning adopted by the majority of courts.   These courts interpret the words "scheduled as" in § 707(b)(2)(A)(iii)(I)

by their "'common, dictionary-defined meaning'. . .   as 'planned for a certain date.'" *In re Rudler*, 576 F.3d 37, 47 (1st Cir. 2009) (quoting *In re Hayes*, 376 B.R. 55, 61 (Bankr. D. Mass. 2007)).  Courts taking this position have held that the statutory phrase asks only for a list of debts secured by property without regard to whether the debtors intend to retain the property or to surrender it.  *E.g., id.* at 47.  They conclude that the plain meaning of the text allows a debtor to deduct all secured payments owed at the time of the bankruptcy filing.  *E.g., id.* at 47-48.  The explanation is that § 707(b)(2)(A)(iii)(I) "does not refer directly to any bankruptcy schedules, and there is no schedule that asks a debtor to identify obligations that are 'contractually due' at the time of the petition, but that may be resolved through surrender of the collateral." *Id.* at 47.  In further support of this analysis, proponents point to the Bankruptcy Code's use of the word "scheduled" in the dictionary-definition sense.  The *Rudler* court uses the example of 11 U.S.C. § 1326(a)(1)(B), which refers to a debtor making pre-confirmation payments "'scheduled in a lease of personal property directly to the lessor.'"  *Id.* at 48 (quoting *In re Hayes*, 376 B.R. at 61-62).

The countervailing view, advanced by the UST, is that "scheduled as" is a term of art within the context of the Bankruptcy Code that refers to "whether a debt is identified on a debtor's bankruptcy schedules."  *In re Skaggs*, 349 B.R. 594, 599 (Bankr. E.D. Mo. 2006) (referencing the example of  11 U.S.C. § 1111(a) which provides that a claim or interest is not deemed filed if it is scheduled as disputed, contingent, or unliquidated on the bankruptcy schedules).  This position is supported by the principle that a court must give effect to every clause and word of a statute.  *Id.*; *In re Harris,* 353 B.R. 304, 307 (Bankr. E.D. Okla. 2006).  According to this viewpoint, the majority position renders the words "scheduled as" superfluous

since all that is required by the majority construction is that the debts be contractually due.  *In re Harris,* 304 B.R. at 307.

Mechanical vs. Realistic Approach

The Court turns now to the second point of contention:  whether § 707(b)(2)(A)(iii)(I) demands a mechanical, snap-shot approach or a realistic, forward-looking approach.  The debtors urge the Court to adopt the majority view, which, historically, has applied a mechanical approach rather than a forward-looking approach in interpreting the embattled phrase "scheduled as contractually due to secured creditors in each month of the 60 months following the date of the filing of the petition."  11 U.S.C. § 707(b)(2)(A)(iii)(I).  Courts taking the majority view have reasoned that at the time a chapter 7 debtor files a bankruptcy petition and completes the means test calculation in form B22A, the debtor will not yet have relinquished the secured property slated for surrender on the Statement of Intention.  *E.g., In re Rudler*, 576 F.3d at 45.  According to this approach, both the B22A form and the statute ask "in the present tense" for a list of debts secured by property.  *Id.* at 46.  "The statutory provision is stated comprehensively, asking for the total of all payments scheduled during the five-year period, without reference to whether other documents filed in connection with the bankruptcy show that the payments are likely to stop during that period."  *Id.*

Proponents of the mechanical approach argue that the means test is intended to determine a debtor's eligibility for chapter 7 relief at a specific point in time without regard to the accuracy of that determination.  *Id.* at 48-49.  "[T]he statute sets allowable expenses by means of several different methods, and, '[l]ike section 707(b)(2)(A)(iii), many other provisions of the means test appear to operate contrary to the goal of accurately determining the amount of income that would actually be available for payments to unsecured creditors in a Chapter 13 case.'"  *Id.* at 48

7

(quoting *In re Walker*, No. 05-15010-WHD, 2006 WL 1314125, at *6 (Bankr. N.D. Ga. May 1, 2006)). This point is illustrated by the calculation of current monthly income as a six-month pre-petition window that ignores a changed state of affairs on the date of bankruptcy filing, *id.* at 48,[6] and by the use of standardized deduction amounts for certain types of expenses that may not accurately reflect the amount of actual expenses. *Id.* at 49 (citing *In re Hayes*, 376 B.R. at 65; *In re Randle,* 358 B.R. 360, 364 (Bankr. N.D. Ill. 2006), *aff'd,* No. 07 C 631, 2007 WL 2668727 (N.D. Ill. Jul. 20, 2007); *In re Walker,* 2006 WL 1314125, at *7).

The majority viewpoint maintains that the plain language of the statute demands a rigid formula and that it does not impose an absurd methodology for assessing abuse. *Rudler,* 576 F.3d at 50. Rather, according to this approach, the mechanical treatment is consistent with Congress's intent to limit the bankruptcy court's discretion to determine abuse on a case-by-case basis. *Id.* Indeed, "choosing the certainty of a mechanical approach over an 'actual circumstances' evaluation under section 707(b)(2) complements the totality-of-the circumstances inquiry prescribed by section 707(b)(3)(B), which remains a backup option when the Trustee is dissatisfied by the results of the means test." *Id.* at 51. "'[I]nclud[ing] the outcome of future events as part of the means test would eliminate the distinction between the presumption of abuse test and the totality of the circumstances test.'" *Id.* (quoting *In re Singletary,* 354 B.R. 455, 465 (Bankr. S.D. Tex. 2006)).

In contrast, the minority position, historically, allows the Court to take into account a debtor's expressed intent to surrender secured property even if the act of surrender has not been completed on the bankruptcy petition date. Courts taking the minority position have reached

---

[6]  As will be discussed below, *see* discussion *infra* pp.12-13, the validity of this argument has been called into question by the Supreme Court's decision in *Hamilton v. Lanning*, 130 S.Ct. 2464 (2010).

their conclusions in a number of ways.  The case of *In re Skaggs,* 349 B.R. 594, involved debtors

who had moved from their mobile home, had ceased payments to the secured lender on the

mobile home prior to filing their chapter 7 case, had filed an original and an amended Statement

of Intention reiterating their intention to surrender the mobile home, and did not contest the

secured lender's motion to lift the automatic stay to proceed against the mobile home.  The

*Skaggs* court held that statutory construction must be approached holistically so that "'[i]n

interpreting one part of a statute, we must not be guided by a single sentence or member of a

sentence, but look to the provisions of the whole law, and to its object and policy.'"  *Id.* at 599

(quoting *Philbrook v. Glodgett,* 421 U.S. 707, 713 (1975), *superseded by statute on other

grounds as recognized in Batterton v. Francis*, 432 U.S. 416 (1977)).

    In emphasizing that a debtor's schedules and statements form the basis from which a

court should determine whether a debt is "scheduled as contractually due," the *Skaggs* court

looked askance at the majority's "focus on the single term 'contractually due' without due

consideration of the import of the term 'scheduled' and the phrase 'in each of the 60 months

following the date of the petition. . . .'"  *Id.* at 599-600 (quoting 11 U.S.C. § 707(b)(2)(A)(iii)(I)).

To allow deductions for payments that "would have been due, but never paid," *id.* at 598, ignores

that "[a] primary intent of Congress in the passage of BAPCPA was to ensure that those debtors

who can pay their debts do so."  *Id.* at 600 (citing *In re Hardacre*, 338 B.R. 718, 725 (Bankr.

N.D. Tex. 2006); 151 Cong. Rec. 2459 at 2469-70 (March 10, 2005)).

    A similar analysis is found in *In re Naut*, No. 07-20280REF, 2008 WL 191297 (Bankr.

E.D. Pa. Jan. 22, 2008), in which the court examined the dictionary definition of the word

"following" as it appears in § 707(b)(2)(A)(iii)(I) and determined it to mean "to go, proceed or

come after," "subsequent to" or "being next in order of time."  *Id.* at *9.  Using this definition,

the court concluded that "[i]ncluding a loan payment as a deduction from income must be based on the loan payment actually being due in each of the 60 months after the bankruptcy petition is filed. Only this interpretation properly gives effect to every clause and word in the statute." *Id.*

Another avenue leading to a similar conclusion is found in *In re Singletary*, 354 B.R. at 458, 465, in which the Court rejected the notion that the means test is a "threshold eligibility test" frozen on the petition date. The *Singletary* court relied on Fifth Circuit precedent found in *In re Cortez*, 457 F.3d 448 (5th Cir. 2006), and on the procedures and timing for filing a presumption of abuse motion outlined in 11 U.S.C. § 704(b) and in Fed. R. Bankr. P. 1017(e). Using this analysis, the court concluded that a motion to dismiss for abuse "may be based on a means test calculation that includes any changed circumstances in the Debtors' position between the filing of the petition and the filing of the motion to dismiss." *Id.* at 465-66.[7]

Recent Developments

The majority viewpoint referenced above is challenged by more recent decisions that call into question its continued validity. In the case of *In re Turner,* 574 F.3d 349 (7th Cir. 2009), the Seventh Circuit reversed the decision of the bankruptcy court which had found it proper for a chapter 13 debtor to include his mortgage payment in the calculation of his disposable income under § 707(b)(2)(A)(iii)(I) and § 1325(b)(2) and (3) even though he intended to surrender the residence. *In re Turner*, 384 B.R. 537 (Bankr. S.D. Ind. 2008). In framing the issue before it, the Court of Appeals recognized the Code's lack of clarity since "[b]oth parties labor mightily to extract from the language of the Bankruptcy Code guidance to whether an expense that affects the debtor's obligation to his unsecured creditors and that by the debtor's own declaration is

---

[7]  The *Singletary* court held that declaring an intent to surrender was insufficient to avoid a finding that the secured debt was properly claimed as a deductable expense on form B22A.  However, if the secured property had been surrendered in fact  and relief from the automatic stay granted before the presumption of abuse motion was filed, the debtors would be denied the deduction.  *Singletary*, 354 B.R.at 458, 467.

10

certain to evaporate before the bankruptcy plan is approved by the bankruptcy judge must nevertheless be treated as if it would persist throughout the entire period during which the plan will be in effect." *Turner*, 574 F.3d at 354.   Although Mr. Turner's plan stated that he "intended to abandon the house to the mortgagee, which would have the same effect as foreclosure in canceling the mortgage," *id.* at 351, he subtracted the monthly mortgage payments of $1,521 from his disposable income for the entire duration of the plan.   He argued that this was permissible despite the fact that his mortgage would be canceled before he was required to make any plan payments. *Id.*

The Court of Appeals took a forward looking approach when it reversed the lower court and held that the chapter 13 debtor, who intended to surrender his residence, could not include the mortgage payment for that residence in the calculation of his disposable income and his projected disposable income.   In the context of plan confirmation, the Court of Appeals found no merit "in throwing out undisputed information, bearing on how much the debtor can afford to pay, that comes to light between the submission and approval of a plan of reorganization." *Id.* at 355.   The Court held that "the calculation of disposable income . . . 'is a starting point for determining the debtor's projected disposable income, . . . [and that] the final calculation can take into consideration changes that have occurred in the debtor's financial circumstances.'" *Id.* at 356 (quoting *In re Frederickson*, 545 F.3d 652, 659-60 (8th Cir. 2008)) (internal quotations removed).   Although the Court of Appeals cautioned that "bankruptcy judges must not engage in speculation about the future income or expenses of the Chapter 13 debtor," *id.* at 356, in the case before it, there was no speculation.   Rather, "all that is at issue is a fixed debt that we know will disappear before the Chapter 13 plan is approved." *Id.*

In addition, the Court of Appeals rejected Mr. Turner's contention that the phrase "scheduled as contractually due to secured creditors in each month of the 60 months following the date of the filing of the petition" demanded a "mechanical" or snap-shot approach. *Id.* at 355. In construing the language of § 707(b)(2)(A)(iii)(I), the Court stated:

> Turner infers from this that the amount of the debtor's payments on account of secured debts, such as a debt secured by a mortgage, must be calculated as of the date of the petition. But that is not what the provision says. It merely specifies that the date of the petition is the date on which the payment period begins.

*Id.* The Circuit Court's interpretation of § 707(b)(2)(A)(iii)(I) refutes the notion that the provision demands that an examination of secured debts must be frozen on the petition date. Moreover, while the Seventh Circuit continued to explain that jurisdictional questions, such as eligibility for chapter 13 relief under 11 U.S.C. § 109(e),[8] should be measured as of the petition date, the Court did not include means testing in that category. *Id.*

After the *Turner* case was decided, the Supreme Court rejected a mechanical approach while evaluating the debtor's income in the case of *Hamilton v. Lanning*, 130 S. Ct. 2464 (2010). In *Lanning*, the Supreme Court determined that, in calculating a chapter 13 debtor's projected disposable income, bankruptcy courts may use a forward looking approach to "account for changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation." *Id.* at 2478. Ms. Lanning's predicament began with a one-time buyout from her former employer that greatly inflated her income in the six-month period preceding her bankruptcy filing and that resulted in her having monthly disposable income of $1,114.98 on

---

[8] 11 U.S.C. § 109(e) defines who may be a chapter 13 debtor by placing debt caps on eligibility for relief under that chapter. The Court of Appeals also used an example of federal diversity jurisdiction to illustrate its point. *Turner*, 574 F.3d at 355.

form B22C.[9]  *Id.* at 2470.  However, as reflected on Schedule I, Ms. Lanning had started a new

job with monthly income of $1,922.00 and her actual monthly expenses, reported on Schedule J,

were $1,772.97.  *Id.*  Subtracting her actual expenses from her actual income resulted in monthly

disposable income of $149.03.  When Ms. Lanning proposed a plan requiring her to pay $144.00

per month for 36 months, the chapter 13 trustee objected, using the mechanical approach.[10]  The

trustee demanded that she pay $756.00 per month for 60 months to properly commit all of her

"projected disposable income" to the repayment of her creditors.  *Id.*  (citing § 1325(b)(1)(B)).

      The Supreme Court rejected the trustee's mechanical approach to determining "projected

disposable income" as "unpersuasive," *id.* at 2474, because it failed to take into account the

undisputed fact that Ms. Lanning's "actual income was insufficient to make payments in that

amount." *Id.* at 2470.  Instead, after analyzing the text of § 1325 and recognizing that pre-

BAPCPA practice allowing discretion[11] had not been discarded with the BAPCPA

amendments,[12] the Court adopted the "forward looking approach" as the "correct" approach  in

calculating a debtor's "projected disposable income."  *Id.* at  2469.  The Court determined that

"the Code does not insist upon rigid adherence to the mechanical approach in all cases . . . ." *Id.*

at 2477.

---

[9] This level of income catapulted Ms. Lanning into the category of an above-median income debtor, subjecting her to means testing under § 707(b)(2)(A) and (B) and requiring her to commit to a 60-month plan.  In contrast, using her income derived from Schedule I would have placed the debtor below the median income for her state, binding her to a plan of only 36 months' duration, and excusing her from means testing.  11 U.S.C. § 1325(b)(3) and (4).

[10] According to Ms. Lanning's trustee, the correct method was to multiply her disposable income of $1,114.98, taken from form B22C, by the 60 months in the applicable commitment period.  *Lanning*, 130 S. Ct. at 2470.

[11] *Id.* at 2473 n.4 ("When pre-BAPCPA courts declined to make adjustments based on possible changes in a debtor's future income or expenses, they did so because the changes were not sufficiently foreseeable, not because they concluded that they lacked discretion to depart from a strictly mechanical approach.").

[12] *Id.* at 2473-74, 2475 ("We decline to infer from § 1325's incorporation of § 707 that Congress intended to eliminate, *sub silentio*, the discretion that courts previously exercised when projecting disposable income to account for known or virtually certain changes.").

Following *Lanning,* in *Ransom v. FIA Card Services, N.A.,* 131 S. Ct. 716 (2011), the Supreme Court examined the expense side of the means test in arriving at a chapter 13 debtor's disposable income.  *Id.* at 721-23.  The Court held that a chapter 13 debtor who owned his or her vehicle outright, without a loan or lease payment, was not entitled to claim an ownership expense under § 707(b)(2)(A)(ii)(I) since the expense was not "applicable" to that debtor.[13]  The lack of a vehicle payment disqualified Mr. Ransom from taking the I.R.S. standard deduction on form B22C because the deduction was not "appropriate, relevant, suitable, or fit" for him.  *Id.* at 724.  The Court reasoned that "a deduction is so appropriate only if the debtor has costs corresponding to the category covered by the table—that is, only if the debtor will incur that kind of expense during the life of the plan."  *Id.*  Turning to the statutory purpose, the Court instructed:

> Congress designed the means test to measure debtors' disposable income and, in that way, "to ensure that [they] repay creditors the maximum they can afford."  H.R. Rep., at 2.  This purpose is best achieved by interpreting the means test, consistent with the statutory text, to reflect a debtor's ability to afford repayment.  Cf. *Hamilton,* 560 U.S., at ____, 130 S.Ct., at 2475-2476 (rejecting an interpretation of the Bankruptcy Code that "would produce [the] senseless resul[t]" of "deny[ing] creditors payments that the debtor could easily make").

*Ransom*, 131 S. Ct. at 725.  The Supreme Court further held that Mr. Ransom was mistaken about what the means test deductions were meant to accomplish.   *Id.* at 730.  Their purpose,

---

[13]   The relevant portion of § 707(b)(2)(A)(ii)(I) provides:

> The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides, as in effect on the date of the order for relief, for the debtor, the dependents of the debtor, and the spouse of the debtor in a joint case, if the spouse is not otherwise a dependent.

11 U.S.C. § 707(b)(2)(A)(ii)(I).

according to the Court, was to "serve merely to ensure that debtors in bankruptcy can afford essential items." *Id*. If a debtor owned a car outright, "he ha[d] no need for this protection." *Id*.

The Supreme Court had granted a writ of certiorari in *Ransom* to resolve a split of authority between the Circuits over whether a debtor who does not make loan or lease payments on his car may claim the deduction set forth in § 707(b)(2)(A)(ii)(1) for vehicle ownership costs. *Id.* at 723. In affirming the decision of the Ninth Circuit in *In re Ransom*, 577 F.3d 1026 (9th Cir. 2009), which had refused the allowance of the car ownership expense, the Supreme Court abrogated the decisions of three Circuit Courts that had allowed the expense. These were: *In re Washburn*, 579 F. 3d 934 (8th Cir. 2009); *In re Tate*, 571 F. 3d 423 (5th Cir. 2009); and *In re Ross-Tousey*, 549 F. 3d 1148 (7th Cir. 2008) (all permitting the allowance of the car ownership expense). *Ransom*, 131 S. Ct. at 723 & n.4. Notably, while *Ransom* and *Washburn* involved chapter 13 debtors, *Tate* and *Ross-Tousey* had brought their cases under chapter 7. Having pointed out that chapter 13 means testing is derived from that of chapter 7,[14] the Supreme Court did not draw a distinction between the chapters in denying the deduction set forth in § 707(b)(2)(A)(ii)(1) for vehicle-ownership costs. If a debtor did not have a loan or lease payment on a car, that debtor could not claim a phantom car ownership expense under either chapter 13 or chapter 7 means testing. *Id*. at 723 & n.4. A fictitious expense should not be allowed either during the life of a chapter 13 debtor's plan or in determining the suitability of a debtor's chapter 7 case.

---

[14]    The Supreme Court stated that the chapter 13 means test "provides a formula to calculate a debtor's disposable income, which the debtor must devote to reimbursing creditors" under a plan of reorganization. *Ransom*, 131 S. Ct. at 721. "Chapter 13 borrows the means test from Chapter 7, where it is used as a screening mechanism to determine whether a Chapter 7 proceeding is appropriate." *Id*. at n.1. "If the debtor's Chapter 7 petition discloses that his disposable income as calculated by the means test exceeds a certain threshold, the petition is presumptively abusive." *Id.*

In chapter 7 cases decided after *Turner, Lanning* and *Ransom*, there continues to be a split of authority on the issue at hand, with the majority of cases adopting the mechanical approach. The majority view is followed in *In re Rivers*, 466 B.R. 558, 566-67 (Bankr. M.D. Fla. 2012) (*Lanning* and *Ransom* do not affect the deductions that a chapter 7 debtor may claim under the means test of § 707(b)(2), which functions as a screening mechanism in chapter 7 and, like eligibility under 11 U.S.C. § 109, should be determined as of the petition date), *In re Sonntag*, No. 10-1749, 2011 WL 3902999, at *3-4 (Bankr. N.D. W. Va. Sept. 6, 2011) (after *Lanning* and *Ransom,* "[g]rafting the forward looking approach now required in Chapter 13 cases onto the means test analysis in Chapter 7 cases is not required, nor justified"), *In re Grinkmeyer*, 456 B.R. 385, 387-88 (Bankr. S.D. Ind. 2011) (finding *Turner, Lanning* and *Ransom* applicable to chapter 13's concept of projected disposable income, which does not exist in chapter 7, and holding that a chapter 7 debtor may deduct mortgage payments on property to be surrendered), and *In re Ng*, No. 10-02001, 2011 WL 576067, at *2-3 (Bankr. D. Haw. Feb. 9, 2011) ("scheduled as" under 11 U.S.C. § 707(b)(2)(A)(iii) does not mean referring to the bankruptcy schedules).

The contrasting position is adopted in *In re Clary*, No. 6:11-bk-04556-ABB, 2012 WL 868717, at *16 (Bankr. M.D. Fla. Mar. 14, 2012) (relying on *Ransom* to find that "[p]ermitting debtors to claim expenses they will not actually pay frustrates legislative intent and creates an inaccurate picture of their financial reality") and *In re Thompson*, 457 B.R. 872, 880-81 (Bankr. M.D. Fla. 2011) (relying on *Ransom* to hold that the definition of payments on account of secured debts in § 707(b)(2)(A)(iii) precludes a debtor from claiming an expense for secured loan payments that are not actually incurred due to cessation of payments and surrender of the property).

16

<u>Analysis and Conclusions</u>

"'A statute is ambiguous when it is capable of being understood by reasonably well-informed persons in two or more different senses.'"  *In re Harris*, 353 B.R. at 307 (quoting *United States v. Quarrell*, 310 F. 3d 664, 669 (10th Cir. 2002)).  Due to the lack of consensus over the meaning of § 707(b)(2)(A)(iii)(I) described above, this Court finds ambiguity in the provision.  As a result, it is forced to find a reading that gives meaning to the intent of the drafters and that prevents a senseless result.

Unfortunately, there is little legislative history to assist the Court.  Most discussion of the legislative history underlying the means test reflects a balancing act, contrasting the drafters' desire to eliminate judicial discretion,  *e.g., In re Rudler*, 576 F.3d at 50-51, with the goal of requiring debtors to pay their debts to the fullest extent they are able.  *E.g., In re Ransom*, 131 S. Ct. at 725.  This Court has found nothing in the legislative history to clarify the meaning that the drafters intended for the words "scheduled as contractually due" nor for the meaning of § 707(b)(2)(A)(iii)(I) in general.  Moreover, there is nothing in the legislative history to indicate that the drafters gave any thought to property on the verge of surrender when they enacted § 707(b)(2)(A)(iii)(I).

This Court agrees with those decisions that interpret the phrase "scheduled as" to be a term of art in bankruptcy parlance that refers to a debtor placing information on the bankruptcy schedules.  *E.g., In re Skaggs*, 349 B.R. at 599; *In re Haar*, 360 B.R. 759, 764-65 (Bankr. N.D. Ohio 2007); *In re Singletary*, 354 B.R. at 467; *In re Ray*, 362 B.R. 680, 685 (Bankr. D. S.C. 2007); *In re Harris*, 353 B.R. at 309-10.   For a debt to be "scheduled as contractually due to secured creditors in each month of the 60 months following the date of the filing of the petition,"

17

a debtor's schedules must show a secured payment arising out of a contractual relationship[15] that is due and being paid post-petition.  In other words, Schedule J and the Statement of Intention must reflect that the debtor intends to pay the secured creditor on the contractual obligation. Thus, although there is no schedule calling for a listing of debts that are "contractually due at the time of the petition, but that may be resolved through surrender of the collateral," *In re Rudler*, 576 F.3d at 47 (internal quotations omitted), information regarding surrender can be obtained easily from existing schedules and related documents.  A court can determine readily if a debtor will be surrendering or retaining property by reviewing Schedule D (where a debtor lists all secured debts), Schedule J and line 20B(b) of form B22A (where a debtor discloses those debts that are being paid), and the Statement of Intention (where a debtor declares, under penalty of perjury, his or her intended treatment of secured property).

In addition, this Court follows that line of reasoning that adopts a realistic approach when property is slated for surrender.  When considering a motion to dismiss for abuse under 11 U.S.C. §§ 707(b)(1) and (2), if a debtor's decision to surrender secured property is "known or virtually certain," *Lanning,* 130 S. Ct. at 2478, that information should be taken into account. Here, where the debtors have indicated they are not paying the Colorado mortgages on Schedule J and line 20B(b) of form B22A, have filed a Statement of Intention to surrender the Colorado property, have not contested the lifting of the automatic stay by the mortgage holder,[16] and all other indicia reflect that surrender is forthcoming, it would be absurd to ignore that evidence. In light of the recent decisions handed down by the Seventh Circuit Court of Appeals and the

---

[15] *See, e.g.,* Morgan D. King, *Bankruptcy Reform Limits, But Does Not Eliminate, Ability to Discharge Delinquent Taxes in Bankruptcy*, 2005  J. Tax Prac. & Proc.35 (2005) (since § 707(b)(2)(A)(iii)(I) references only secured debts that are "contractually due," it may exclude a tax lien because it is not a contractual debt).
[16]   On November 29, 2011, Chase Home Finance LLC was granted relief from the automatic stay to proceed with foreclosure on the Colorado home without objection from the debtors.

United States Supreme Court, *see* discussion *supra* pp. 10-15, this is the only reading of § 707(b)(2)(A)(iii)(I) that gives expression to the drafters' intent and that avoids a senseless result.

Moreover, as discussed previously, *see* discussion *supra* p. 12, the Seventh Circuit has examined the meaning of § 707(b)(2)(A)(iii)(I)'s phrase, "scheduled as contractually due to secured creditors in each month of the 60 months following the date of the filing of the petition." In *Turner*, the Court of Appeals rejected the notion that the calculation of secured debt must be fixed on the chapter 13 petition date. *Turner*, 574 F.3d at 355. In light of the Seventh Circuit's construction of this phrase, this Bankruptcy Court can find no basis for defining the phrase one way when it is incorporated by reference into chapter 13 means testing, 11 U.S.C. § 1325(b)(3), and a different way when it is applied in chapter 7 means testing. The rules of statutory construction demand that a discrete provision be read consistently wherever it appears in the same statute. *E.g., Powerex Corp. v. Reliant Energy Services, Inc.*, 551 U.S. 224, 232 (2007) ("identical words and phrases within the same statute should normally be given the same meaning"); *Belom v. National Futures Ass'n*, 284 F.3d 795, 798 (7th Cir. 2002) (a court "can assume that Congress intended the same terms used in different parts of the same statute to have the same meaning"). Therefore, the Seventh Circuit's construction of the language of § 707(b)(2)(A)(iii)(I), rejecting a determination of the amount of secured debt that is frozen on the petition date, applies equally in chapter 7 means testing.

It is also apparent that the drafters knew how to limit the means testing calculation to the date of the petition had that been their intent. An example with the necessary clarity is found in § 707(b)(2)(A)(ii)(I)'s direction to use the National and Local standards and the categories of Other Necessary Expenses issued by the Internal Revenue Service "as in effect on the date of the

order for relief. . ." to compute the relevant monthly expenses of the debtor.   11 U.S.C. § 707(b)(2)(A)(ii)(I); *see* text of statute *supra* note 13.

A forward looking approach is supported further by form B22A's instructions to list "Future payments on secured claims" at line 42.  The significance of this instruction should not be minimized.  Form B22A was created by the Judicial Conference of the United States in October 2005, after passage of BAPCPA, for the purpose of assisting practitioners in calculating disposable income. *See In re Scott*, 457 B.R. at 744.[17]  Since form B22A provides the map for chapter 7 means testing, its reference to "[f]uture payments on secured claims" is compelling evidence that the Court need not restrict its inquiry to a snap-shot taken on the petition date while discarding facts that reflect the true picture of a debtor's finances.

In cases decided subsequent to the *Turner* court's opinion prohibiting a chapter 13 debtor from deducting a nonexistent mortgage payment from his disposable income and projected disposable income, various courts have distinguished *Turner's* holding when the case before the court is a chapter 7 case.  In *In re Vecera,* 430 B.R. 840, 844 (Bankr. S.D. Ind. 2010), the bankruptcy court held that "*Turner's* forward looking approach applies to cases filed under

---

[17]    As this Court explained in *Scott*:

> The Judicial Conference of the United States is the principal policy making body concerning the administration of the United States Courts.  It is comprised of the Chief Justice of the United States, the chief judge of each judicial circuit, the Chief Judge of the Court of International Trade, and a district judge from each regional judicial circuit.  The Conference operates through a number of committees created to advise on a wide range of subjects, including rules of practice and procedure. . . . The Conference derives its authority from 28 U.S.C. § 331.  Pursuant to Federal Rule of Bankruptcy Procedure 9009, "the Official Forms prescribed by the Judicial Conference of the United States shall be observed and used with alterations as may be appropriate. . . . The forms shall be construed to be consistent with [the Rules of Bankruptcy Procedure] and the Code."  Fed. R. Bankr. P. 9009.

*In re Scott*, 457 B.R. at 744 n.3.

Chapter 13 and to the calculation of 'projected disposable income' under § 1325 . . . [but] it does

not apply to the determination of 'disposable income' and whether the presumption of abuse

arises under § 707(b)(2) in chapter 7 cases."  *Id.*

This Court's reading of *Turner*, 574 F.3d 349, however, suggests that the Court of

Appeals did not draw such a clear-cut distinction and, in fact, discussed both disposable income

and projected disposable income in its opinion.  *Id.* at 355-56.  In describing the situation before

it, the *Turner* Court referred to:

> [a] fixed *debt* that will disappear:  the deduction of mortgage
> expense from the Chapter 13 debtor's **disposable income** is not
> intended to enrich the debtor at the expense of his unsecured
> creditors.  It is intended to adjust the respective rights of a secured
> creditor—the mortgagee—and the unsecured creditors.  Turner
> wants to use a phantom deduction to reduce the recovery by his
> unsecured creditors without benefiting any other creditor.

*Id*. at 356 (emphasis added).

The Court finds that the *Turner* Court's cautionary statement, focused on deducting a

phantom  mortgage payment from disposable income to the detriment of unsecured creditors in a

chapter 13 case, applies equally in chapter 7 means testing.   This conclusion is buttressed by the

*Ransom* Court's reasoning that "Congress designed the means test to measure debtors'

**disposable income** and, in that way, 'to ensure that [they] repay creditors the maximum they can

afford.'  H.R. Rep., at 2."  *Ransom*, 131 S. Ct. at 725 (emphasis added).   The case of *In re*

*Vecera*, 430 B.R. 840, was decided after *Turner*, but pre-dated *Lanning* and *Ransom*.   In drawing

a distinction between chapter 13 and chapter 7 debtors, the *Vecera* court, *id.* at 844, relied in part

on the Seventh Circuit's decision in *In re Ross-Tousey,* 549 F.3d 1148.   However, as previously

discussed, *Ross-Tousey*, a chapter 7 case allowing a fictitious car ownership expense, was

abrogated by the Supreme Court when it disallowed the same phantom expense to Mr. Ransom, a chapter 13 debtor. *Ransom*, 131 S. Ct. at 723 & n.4.

In addition, although the instant case does not involve a calculation of "projected disposable income," the tenets articulated in *Lanning*, 130 S. Ct. 2464, are applicable here. They lead to the conclusion that "foreseeable changes in a debtor's income or expenses" should not be ignored in favor of "rigid adherence to [a] mechanical approach" that disregards known facts. *Id*. at 2469, 2477. Here, on the petition date, the record was unequivocal that the debtors were not paying, and it was a virtual certainty that they would never again pay, the mortgages on the Colorado real estate. To allow them to deduct a fictitious monthly payment of $1,973.23 would be senseless and contrary to the intent of Congress to steer debtors who are able to fund a chapter 13 plan into that chapter. While much has been made of Congress' desire to remove judicial discretion in application of the means test, there is no indication that this goal was intended to overshadow the overall goal of directing financially able debtors into chapter 13 cases. *See, e.g., In re Ransom*, 131 S. Ct. at 729 ("BAPCPA's core purpose [is] ensuring that debtors devote their full disposable income to repaying creditors"). In fact, the debtors admit that "there would be some ability to fund a Chapter 13 Plan due to the student loan and tax payments being paid through a plan. . . ." Debtors' Resp. to U.S. Trustee's Am. Mot. to Dismiss Case at 6.

The *Ransom* decision also is instructive on another point. In its decision, the Supreme Court discussed the anomaly of allowing a phantom vehicle ownership expense to above-median income chapter 13 debtors while those with incomes below the median, who must justify each expense as reasonably necessary on a case-by-case basis, cannot claim a deduction for a fictitious expense. *Ransom,* 131 S.Ct. at 725 n.5. In disallowing such "preferential treatment," the Court concluded that "[i]f a below-median-income debtor cannot take a deduction for a

nonexistent expense, we doubt Congress meant to provide such an allowance to an above-median-income debtor—the very kind of debtor whose perceived abuse of the bankruptcy system inspired Congress to enact the means test." *Id*.  In much the same way, the instant debtors' reading of § 707(b)(2)(A)(iii) affords "preferential treatment" to those debtors who opted for larger mortgages initially.  Allowing nonexistent mortgage payments to be deducted in the amount "contractually due" bestows a disproportionate benefit upon debtors surrendering property encumbered by larger mortgages.  This is an absurd result considering that all debtors who have ceased payment on their surrendered real property, regardless of the contractual payment amount, are now paying the same amount on their mortgages—nothing.  *Cf*. A. Jay Cristol & Cheryl Kaplan, *11 U.S.C. § 707(b)(2)(A)(iii):  Does It Mean What It Says And Say What It Means?,* 19 U. Fla. J.L. & Pub. Pol'y 1, 9 & n.44 (2008) (citing Charles J. Tabb & Jillian K. McClelland, *Living With the Means Test,* 31 S. Ill. U. L.J. 463, 492 (2007)) ("the secured debt deduction rewards the debtor who has larger amounts of secured debt").

Based on the above analysis, this Court holds that to harmonize the language of § 707(b)(2)(A)(iii) with the intent of the drafters, and to avoid a senseless result, the Fredmans may not deduct the $1,973.23 phantom monthly mortgage payments at line 42 of form B22A. The Court is not persuaded otherwise by a final argument advanced by the majority which insists that adopting the forward looking approach blurs the distinction between the presumption of abuse test, 11 U.S.C. § 707(b)(2), and the totality of the circumstances test.  11 U.S.C. § 707(b)(3)(B).  *See* discussion *supra* p. 8.  This argument is not convincing because the breadth of the tests are wholly different.  Under § 707(b)(2)(A)(iii), a Court is evaluating a discrete issue— whether a nonexistent payment for property that a chapter 7 debtor declares surrendered may be

deducted in determining disposable income.  The totality-of-the-circumstances inquiry goes far beyond that question and examines factors such as:

> (1) circumstances surrounding the debtor's finances, which include the debtor's ability to pay creditors, whether the debtor's budget is excessive, whether the debtor has reaffirmed a large amount of secured debt, whether the debtor has a stable income, whether there was incurrence of cash advances or excessive consumer purchases; (2) the [d]ebtor's truthfulness on her schedules accurately reflecting the debtor's true financial circumstances and whether the debtor filed in good faith; and (3) other factors to consider such as illness, calamity, unemployment or disability that precipitated the filing and whether the debtor could have negotiated with creditors outside the bankruptcy.

*In re Steinberg*, No. 09-20988, 2010 WL 4642059, at *3 (Bankr. D. Wyo. Oct. 8, 2010) (outlining factors to consider in determining abuse under the bad faith or totality of the circumstances standards in 11 U.S.C. § 707(b)(3)(A) and (B)).  Therefore, application of a realistic approach in the instant case is not precluded by the existence of a totality of the circumstances test.

Moreover, this Court's decision in *In re Scott*, 457 B.R. 740, is consistent with the result reached here.  In *Scott,* the Court examined whether debtors, who had a lower car ownership expense than the standardized amount set forth in the statute, § 707(b)(2)(A)(ii)(I), would be allowed the benefit of the full deduction.  *Id*. at 742.  In concluding that "Congress did not tell us to use actual expenses for the categories subject to the national and local standards, although it clearly knew how, had it chosen to do so," *id*. at 746, the Court was dealing with an entirely dissimilar situation.  Had the Court in *Scott* allowed deductions limited to the debtors' actual car ownership expenses, this would have obliterated the meaning of the statute which expressly called for the use of standardized amounts rather than actual amounts in the category of car

ownership expense.   The debtors in *Scott* all had car ownership expenses that triggered the application of the statute and its standardized expenses.   *See, e.g., In re Egbert,* 384 B.R. 818, 829-30 (Bankr. E.D. Ark. 2008) (Congressional intent behind § 707(b)(2)(A)(ii)(I) was to grant debtors a fixed amount of reasonable living expenses in certain categories which fall under national and local standards with the result that a debtor may deduct the amount specified in these standards even where the actual expense is less).

The instant case presents an altogether different scenario since, according to this Court's reading, § 707(b)(2)(A)(iii)(I) calls for a  debtor to list the actual  cost of secured debt that will be paid during the 60-month post-petition period.   Where there is no actual cost reflected on the bankruptcy schedules, since the debtor is surrendering the property and not paying the debt, that fact must be recognized and the phantom payment excluded from the calculation of "average monthly payments on account of secured debts."   11 U.S.C. § 707(b)(2)(A)(iii).

Based on the foregoing, the debtors may not claim deductions under 11 U.S.C. § 707(b)(2)(A)(iii) for the Colorado mortgages that encumber surrendered real estate.   The Court now must determine whether a presumption of abuse arises from this outcome.   To make this determination, the Court adjusts the figures on debtors' amended B22A form to remove $1,973.23 in phantom monthly mortgage payments from lines 42, 46, 47, and 49 of the form. After making these adjustments, the debtors have "60-month disposable income" of $104,754.00 at line 51 of the form.   Since this figure far exceeds the $11,725 figure provided for comparison at line 52 of the B22A form, the presumption of abuse does arise.   This presumption is not overcome even when the Court takes into account $545.00 in additional expenses that the debtors claim in Part VII of the B22A form.   As a result, the UST's motion to dismiss the case is granted pursuant to 11 U.S.C. §§ 707(b)(1) and (b)(2).

See Order entered this date.

ENTERED:  May 31, 2012

/s/ Laura K. Grandy
_____
UNITED STATES BANKRUPTCY JUDGE